## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **DENISE M. JEROME,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 2009-092** |
| **WATERSPORTS ADVENTURE  RENTALS** | ) | |
| **AND EQUIPMENT, INC., d/b/a/ ISLAND** | ) | |
| **FLIGHT ADVENTURES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ——————————————————— | ) | |

**Attorneys:**
**A. Jeffrey Weiss, Esq.,**
St. Thomas, U.S.V.I.
**K. Glenda Cameron, Esq.,**
St. Croix, U.S.V.I.
        *For the Plaintiff*

**Robert L. King, Esq.,**
St. Thomas, U.S.V.I.
        *For the Defendant*

## MEMORANDUM OPINION

**Lewis, District Judge**

THIS MATTER is before the Court on the "Renewed Motion In Limine to Exclude the Opinion of Dr. Richard Moore" (Dkt. No. 238) filed by Defendant Watersports Adventure Rentals and Equipment, Inc., doing business as Island Flight Adventures ("IFA"). Plaintiff opposes the Motion. For the reasons that follow, the Court will grant in part and deny in part IFA's Motion.

### I.    BACKGROUND

Plaintiff Denise Jerome initiated this action to recover damages for personal injuries allegedly sustained during a jet ski and snorkeling tour provided by IFA in the waters off of St. Croix, United States Virgin Islands on March 12, 2009.

On February 10, 2013, IFA filed a "Motion In Limine to Exclude the Opinion of Dr. Richard Moore" and a supporting memorandum seeking to exclude portions of the proposed testimony of Plaintiff's proffered economic expert as unreliable pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Dkt. Nos. 200, 201). After requesting and receiving four extensions of time within which to respond to the Motion (*see* Dkt. Nos. 210, 217, 219, 221), Plaintiff filed her Opposition on March 14, 2013. (Dkt. No. 222). In her Opposition, Plaintiff disagreed with the arguments advanced by IFA, and claimed that they ignored amended reports prepared by Dr. Moore and his deposition testimony. (*Id.* at 22-32).

In a Memorandum Opinion issued on April 15, 2013, the Court concluded that the record before it was insufficient to properly evaluate the admissibility of Dr. Moore's proposed testimony because the parties' briefing addressed three markedly different expert reports. (Dkt. No. 232 at 5).[1] Accordingly, the Court denied IFA's Motion without prejudice, and granted IFA until April 25, 2013 to file another motion if it still sought to challenge Dr. Moore's testimony in light of the more recently filed amended reports. The Court granted Plaintiff until May 6, 2013 to respond. (*Id.*).

 IFA complied with the Court's Order, and on April 25, 2013, filed the instant "Renewed Motion In Limine to Exclude the Opinion of Dr. Richard Moore," a supporting memorandum, and selected portions of the transcript of Dr. Moore's October 2, 2012 deposition. (Dkt. Nos. 238, 239, 239-1). Plaintiff failed to respond in the time initially provided, and on May 10, 2013, the Court issued an Order indicating that it would consider IFA's Motion to be unopposed unless

---

[1] The Court specifically noted the differences among the total in damages listed in each report: $3,733,003; $1,841,387; and $1,802,705. *Jerome v. Water Sports Adventure Rentals & Equip., Inc.*, 2013 U.S. Dist. LEXIS 54843, *6 n.3 (D.V.I. Apr. 15, 2013).

Plaintiff filed a response on or before May 13, 2013. (Dkt. No. 243). On May 13, 2013, Plaintiff filed a "Motion to Extend Time" (Dkt. No. 244) requesting that the Court extend the time period for her to respond until May 24, 2013. The Court granted Plaintiff's request (Dkt. No. 245), and Plaintiff filed her Opposition on May 24, 2013. (Dkt. No. 247). The Court ordered IFA to file a complete copy of Dr. Moore's deposition transcript by May 31, 2013 (Dkt. No. 248), and IFA filed the transcript in the time provided. (Dkt. No. 255-1). The matter is ripe for resolution.

## II.   LEGAL PRINCIPLES

District courts have a "gatekeeping" function in connection with expert testimony. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012); *Barnes v. Century Aluminum Co.*, 2013 U.S. Dist. LEXIS 42311, *13 (D.V.I. Mar. 26, 2013) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997), and *Daubert*, 509 U.S. at 589); *Muhsin v. Pac. Cycle, Inc.*, 2012 U.S. Dist. LEXIS 80441, *9 (D.V.I. June 8, 2012) (citations omitted). Federal Rule of Evidence 702, as amended in 2000 to incorporate the standards set forth by the Supreme Court in *Daubert*, requires district courts to ensure that expert testimony is not only relevant, but reliable. *ZF Meritor*, 696 F.3d at 291 (citations omitted).

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As the Third Circuit has explained, Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir.

2003); *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact."). "Qualification refers to the requirement that the witness possess specialized expertise." *Schneider*, 320 F.3d at 404. To establish reliability, the testimony "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his o[r] her belief." *Id.* (citations and internal quotation marks omitted); *see also Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (noting that district courts must ensure that "the expert's opinion [is] based on the methods and procedures of science rather than on subjective belief or unsupported speculation") (citations and internal quotation marks omitted). To satisfy the fit requirement, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404.

The party proffering expert testimony bears the burden of demonstrating that the testimony satisfies the requirements of Rule 702. *Virgin Islands v. Jacobs*, 2001 U.S. Dist. LEXIS 22511, *12-13 (D.V.I. Dec. 28, 2001) (citations omitted); *Mercedes-Benz USA, Inc. v. Coast Auto. Group, Ltd.*, 362 F. App'x 332, 335 (3d Cir. 2010) (citations omitted).

## III.   DISCUSSION

Pursuant to Rule 702, IFA challenges the reliability—and therefore the admissibility—of portions of Dr. Moore's proposed testimony. Specifically, IFA contests: (1) the sufficiency of the factual basis supporting Dr. Moore's opinions regarding Plaintiff's post-injury earning capacity; and (2) the accuracy of certain calculations. Before reaching these arguments, the Court will address two preliminary issues raised by the parties: (1) whether the Court may rely on Dr.

4

Moore's unsigned deposition transcript; and (2) the admissibility of two of the three expert reports generated by Dr. Moore.

## A.    Deposition Transcript

In support of its challenge to Dr. Moore's expert reports, IFA relies on portions of his deposition transcript (Dkt. No. 255-1) in which he discusses the first two reports, calculations contained therein, and the methodology employed in reaching his opinions. (Dkt. No. 239 at 4-10). In her Opposition, Plaintiff objects to the use of the transcript on the grounds that it has "not been completed" because Dr. Moore has not been provided "with the opportunity to review that transcript and correct any errors found therein even though he did not waive the right to review and sign the transcript." (Dkt. No. 247 at 8). The Court rejects Plaintiff's argument as contrary to the Federal Rules of Civil Procedure.

Rule 30(e)(1) of the Federal Rules of Civil Procedure provides:

(e) Review by the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e)(1). Thus, under Rule 30(e), if the deponent has properly requested to review the transcript, he may submit changes to the deposition "within thirty days after being notified by the officer that the transcript is available for review." *EBC, Inc. v. Clark Bldg. Sys.*, 618 F.3d 253, at 265-66 (3d Cir. 2010) (citations and internal quotation marks omitted). As the Third Circuit has emphasized, "Rule 30(e)'s thirty-day clock begins to run when the party is

5

notified by the court reporter that [the] transcript is available for review, *not* when the party or deponent physically receives the transcript from the court reporter." *Id.* (citations omitted, original emphasis).

Here, a copy of email correspondence between the officer (court reporter) for Dr. Moore's deposition and counsel for Plaintiff, and an invoice for transcript preparation, indicate that counsel for Plaintiff was notified on October 17, 2012 that the transcript was available for review. (Dkt. No. 265-1 at 2; Dkt. No. 254-1 at 3). The correspondence further reveals that on November 2, 2012, the court reporter explained that the transcript could not be sent to Dr. Moore before counsel for Plaintiff provided her with Dr. Moore's mailing address. Counsel for Plaintiff responded on that same day, indicating that he would provide the necessary mailing address and "take[] care" of the invoice. (Dkt. No. 265-1 at 1-2). IFA contends that despite this correspondence, the deposition transcript was never sent for Dr. Moore's review, nor a copy to counsel for Plaintiff, because the address was never provided and the invoice never paid. (Dkt. No. 254 at 1-2). Plaintiff has not responded directly to these contentions, but agrees that Dr. Moore has not been provided with a copy of the transcript. (Dkt. No. 247 at 8).

In view of the foregoing, the thirty-day window provided by Rule 30(e) for Dr. Moore to review and/or alter his deposition transcript began on October 17, 2012, and has long since expired. The fact that Dr. Moore has not received a copy of the transcript does not change the Court's conclusion because the time period begins to run upon notification of the availability of the transcript, not upon the deponent's receipt thereof. *EBC, Inc.*, 618 F.3d at 266. Because "[t]he procedural requirements of Rule 30(e) are clear and mandatory," *id.* at 265, the Court finds that Dr. Moore's opportunity to review and make any changes to the deposition transcript has

passed. The Court, therefore, may—and will—rely on the existing transcript in evaluating Dr. Moore's proposed expert testimony.

**B.      Admissibility of Expert Reports**

IFA challenges the admissibility of two expert reports prepared by Dr. Moore and submitted after Plaintiff's expert disclosure deadline. (Dkt. No. 239 at 20-23). The Court will discuss and resolve this threshold issue before addressing IFA's substantive challenges.

**1.      Background**

By Order dated October 18, 2011, the Court established that Plaintiff's "experts shall be named and copies of their opinions as provided in Fed. R. Civ. P. 26(a)(2) shall be submitted on or before **November 18, 2011**." (Dkt. No. 75 at 4) (original emphasis).[2] By Notice dated November 18, 2011 (Dkt. No. 82), Plaintiff filed a copy of Dr. Moore's report dated November 8, 2011 and titled "A Report on the Estimated and Projected Lost Earning Capacity of Ms. Denise Jerome" ("First Expert Report"). In this First Expert Report (Dkt. No. 201-2), Dr. Moore identifies six categories of economic damages that Plaintiff has allegedly suffered as a result of the jet ski accident: (1) lost past earning capacity in her field as a dancer/choreographer; (2) past medical expenses; (3) increased cost of insurance premiums from the accident until the date of the First Expert Report; (4) lost future earning capacity in the dance field; (5) increased cost of future insurance premiums; and (6) cost of future medical expenses. After reducing the total amounts for future damages to their present value, the First Expert Report concludes that Plaintiff's damages total $3,733,003.

---

[2] As the Court noted in a previous Memorandum Opinion, Plaintiff's expert disclosure deadline was initially set for May 13, 2011, before being postponed four times in response to requests from the parties, and ultimately set for November 18, 2011. *Jerome v. Water Sports Adventure Rentals & Equip., Inc.*, 2013 U.S. Dist. LEXIS 52931, *2-3 n.1 (D.V.I. Apr. 12, 2013).

On October 2, 2012, the deposition of Dr. Moore was conducted. As the transcript indicates, Dr. Moore brought with him to the deposition an amended expert report dated October 1, 2012 ("Second Expert Report"), which had not previously been provided to IFA. Counsel for IFA objected to the late disclosure of the Second Expert Report and refused to question Dr. Moore regarding its contents, but ultimately acquiesced to the marking of the report as a deposition exhibit. (*See* Dkt. No. 255-1 at 10-12). The Second Expert Report (Dkt. No. 222-5) is nearly identical to the First, with the exception of three purported calculation corrections.[3] The Second Expert Report does not rely on any new sources of evidence or otherwise alter the methodology employed in the First Expert Report. As a result of the calculation corrections, however, Dr. Moore reduces his damages total from $3,733,003 to $1,841,387.

On February 10, 2013, IFA filed a Motion and supporting memorandum seeking to exclude portions of these two reports as unreliable. (Dkt. Nos. 200, 201). On March 14, 2013, after requesting and receiving four extensions of time within which to respond (*see* Dkt. Nos. 210, 217, 219, 221), Plaintiff filed her Opposition to the Motion. (Dkt. No. 222). As an attachment to this Opposition, Plaintiff filed an amended expert report dated March 12, 2013 ("Third Expert Report") (Dkt. No. 222-6). The Third Expert Report differs significantly from the two earlier reports, and addresses some of the alleged deficiencies identified by IFA during the deposition of Dr. Moore and in its subsequent Motion to exclude Dr. Moore's testimony. Most

---

[3] In particular, the Second Amended Report: (1) increases (from $8 to $16) the figure listed as twice the minimum wage in California, which Dr. Moore assumes to be the hourly wage Plaintiff is capable of earning after the accident; (2) increases the discount rate applied to future damages to calculate their present value; and (3) removes an instance of "double counting" of certain medical bills. (*Compare* Dkt. No. 202-1 *with* Dkt. No. 222-5). During his deposition, Dr. Moore explained that the Second Expert Report was not a new report, but simply a corrected version of the prior report designed to cure these arithmetic and "double counting" errors. (Dkt. No. 255-1 at 182).

notably, the Third Expert Report offers a new methodology for calculating Plaintiff's lost future earning capacity.[4] As a result of this and other changes,[5] the Third Expert Report further reduces Plaintiff's damages total to $1,802,705.

IFA argues that the Court should exclude both the Second and Third Expert Reports in their entirety because they were disclosed in an untimely fashion and in violation of Fed. R. Civ. P. 26. (Dkt. No. 239 at 20-23). IFA also contends that the Third Expert Report should be stricken as a "transparent attempt to fix the weaknesses in [Dr. Moore's] methodology." (*Id.* at 21). Plaintiff, in turn, asserts that IFA has failed to "act[] to cure any untimeliness or surprise which may have resulted from [the] receipt of" the Second and Third Reports, and claims that IFA should "re-depose Dr. Moore" or have its own economic expert review the reports and produce "their own counter-report." (Dkt. No. 247 at 3). The Court will consider these arguments within the analytical framework enunciated by the Third Circuit in *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012).

---

[4] As discussed at length *infra*, Part III.C., in his First and Second Expert Reports, Dr. Moore calculates Plaintiff's lost future earning capacity by projecting what he assumes Plaintiff would have earned working in the dance-related field over the remainder of her work-life expectancy, and subtracting what he believes she is now capable of earning after the injury. In the first two reports, Dr. Moore calculates Plaintiff's projected future earnings by assuming she will be able to work 20 hours per week in "retail," and that she will earn twice the minimum wage for her home state. In the Third Expert Report, however, Dr. Moore abandons this hourly wage approach entirely. In its place, he states: "In 2009, the year of her injury, the median earnings of a part[-]time white woman employee was $225/week or $10,800 per year." Dr. Moore provides no additional support for this conclusion, but nonetheless states that "this will represent [Plaintiff's] post-injury earning capacity" from the date of her injury "forward through to her work life expectancy." (Dkt. No. 222-6 at 8).

[5] The Third Expert report also: (1) further corrects and reduces damages calculations; and (2) identifies additional sources, largely from Plaintiff's medical records, upon which Dr. Moore relies to support his conclusions. (*Compare* Dkt. No. 222-6 *with* Dkt. No. 222-5 *and* Dkt. No. 202-1).

### 2.      Applicable Legal Principles

In *ZF Meritor*, the Third Circuit evaluated a trial court's decision to prohibit plaintiffs'
economic expert from submitting alternate damages calculations in an antitrust case where the
expert disclosure deadline had already passed by the time the alternate calculations were
disclosed. Specifically, following a pretrial *Daubert* challenge, the trial court found the expert's
opinion regarding lost profits to be unreliable because it was based on an internal business plan,
and the expert did not know the qualifications of the individuals who prepared the plan or the
assumptions upon which the plan's estimates were based. *ZF Meritor*, 696 F.3d at 291. The
plaintiffs subsequently requested that the expert be permitted to amend his report to include
alternate lost profit calculations which did not rely on the business plan, but employed the same
methodology used in the original report and relied on other data contained in the original report.
*Id.* The trial court denied the plaintiffs' request.

In addressing the trial court's decision to prohibit the expert from amending his report to
include the alternate damages calculations, the Third Circuit considered the following
"*Pennypack*" factors:

> (1) "the prejudice or surprise in fact of the party against whom the excluded
> witnesses would have testified" or the excluded evidence would have been
> offered; (2) "the ability of that party to cure the prejudice"; (3) the extent to which
> allowing such witnesses or evidence would "disrupt the orderly and efficient trial
> of the case or of other cases in the court"; (4) any "bad faith or willfulness in
> failing to comply with the court's order"; and (5) the importance of the excluded
> evidence.

*ZF Meritor*, 696 F.3d at 298 (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559
F.2d 894, 904-05 (3d Cir. 1977)); *see also Jerome v. Water Sports Adventure Rentals & Equip.,
Inc.*, 2013 U.S. Dist. LEXIS 52931, *4-5 (D.V.I. Apr. 12, 2013) (applying same factors).

Applying these *Pennypack* factors, the Third Circuit concluded that the trial court abused its discretion by prohibiting the expert from amending his opinion to include alternate damages calculations. With respect to the first two factors, the Third Circuit noted that the defendant would not be prejudiced by the introduction of the amended report because the alternate calculations: (1) were based on the data from the initial expert report, which the defendant had been aware of for years; and (2) employed the same methodology as the original report. Thus, the defendant would not "have to analyze any new data, or challenge any new methodologies." *Id.* Considering the third factor, the Third Circuit concluded that amendment of the report would not disrupt the orderly and efficient flow of the case because the matter was remanded to the trial court to conduct the damages phase of the bifurcated proceedings. While the defendant originally asserted that amendment of the expert report was improper because plaintiffs sought to do so "on the eve of trial," the Third Circuit noted that "there was no longer any time-crunch problem" as a result of the appeal and remand. *Id.* at 298-99.

Turning to the fourth factor, the Third Circuit concluded that there was no evidence of any bad faith on the part of the plaintiffs in seeking to amend the expert report. However, the Third Circuit noted that it could also consider the plaintiffs' justification for failing to include the alternative calculations in the first report. Ultimately, the Third Circuit found that the plaintiffs' choice to rely heavily on data (the business plan) that was found to be unreliable weighed in favor of exclusion of the alternate calculations. *Id.* at 299 (stating that "[i]t is not the district court's responsibility to help a party correct an error or poor exercise of judgment" regarding the sufficiency of proposed expert testimony).

Finally, the Third Circuit addressed "perhaps the most important factor" in the case—the "critical nature of the excluded evidence, and the consequences if permission to amend [the

11

expert report] is denied." *Id.* The Third Circuit found that expert testimony is necessary to establish damages in an antitrust case, and that the plaintiffs would be unable to pursue damages—even though they had prevailed during the liability phase of the proceedings—if the expert could not present his alternative damages calculation. After considering all five factors, the Third Circuit concluded that the trial court abused its discretion in not permitting the plaintiffs to submit their alternate damages calculations. *Id.* at 300.

Applying the *Pennypack* factors to the case at bar, the Court will prohibit Plaintiff from presenting the new methodology for calculating lost earning capacity that was first identified in the Third Expert Report. *See* Part III.C., *infra*. However, the Court will deny IFA's request to exclude the remainder of the Second and Third Expert Reports.

### 3.      The Second Expert Report

With regard to the Second Expert Report, the Court finds—in applying the first two *Pennypack* factors—that IFA will not be prejudiced by its introduction. The Second Expert Report makes three computational corrections to the initial report, but does not alter the methodology employed or assert any new factual underpinnings for the opinions contained therein. *See ZF Meritor*, 696 F.3d at 298 (noting that the defendant was not prejudiced by introduction of the amended report because it did not "have to analyze any new data, or challenge any new methodologies"). During his deposition, Dr. Moore repeatedly conceded that the First Expert Report contained multiple computational errors, and explained the changes he made in the Second Expert Report to cure those errors. (*See, e.g.,* Dkt. No. 255-1 at 33). Further, these corrections resulted in a significantly lower, not higher, estimation of total damages.

The Court also finds that the introduction of the Second Expert Report, which was disclosed to IFA on October 2, 2010, will not "disrupt the orderly and efficient trial of the case or

of other cases in the court." *ZF Meritor*, 696 F.3d at 298. Dr. Moore discussed the computational corrections contained in the Second Expert Report during his deposition, and IFA has since had the opportunity to challenge the report in two subsequent *Daubert* motions. These challenges have been fully briefed, and are resolved by the Court *infra*, Part III.C. Thus, as in *ZF Meritor*, there is no "time-crunch problem" resulting from the submission of the Second Expert Report. *Id.* at 298-99.

The fourth factor also militates against exclusion of the Second Expert Report. IFA has presented no evidence that Plaintiff acted in bad faith by submitting an amended report to correct computational errors. Moreover, Dr. Moore readily acknowledged these errors during his deposition testimony, further undercutting any claim of foul motive.

Finally, the importance of the Second Expert Report weighs against its exclusion. The First Expert Report presents Plaintiff's calculations regarding all damages in this case, and the Second Expert Report corrects multiple computational errors contained in the First Report. It is important for damages calculations presented to the jury to be mathematically accurate. Thus, this factor also militates against exclusion of the more accurate Second Expert Report.

Because all five *Pennypack* factors weigh against exclusion, the Court will deny IFA's request to exclude the Second Expert Report.

### 4.    The Third Expert Report

The Third Expert Report presents a more complicated question on the subject of admissibility than the Second Report. As Dr. Moore notes, the amendment of the Second Expert Report through issuance of the Third Expert Report "occur[ed] in order to add additional useful information." (Dkt. No. 222-6 at 2). In particular, the Third Expert Report: (1) further corrects

13

and reduces damages calculations;[6] (2) identifies additional sources, largely from Plaintiff's medical records, upon which Dr. Moore relies to support his conclusions; and (3) presents an entirely new methodology for calculating Plaintiff's lost future earning capacity. The Court will address the implications of these additions.

### i.      Corrected Calculations and Additional Sources

As with the Second Expert Report, the Court finds that IFA will not be prejudiced by the introduction of the Third Expert Report's calculation corrections or its additional summaries of medical records. IFA has not demonstrated how introducing more mathematically accurate and reduced damages calculations would prejudice it in this matter.

Similarly, IFA has pointed to no prejudice resulting from the addition of sources upon which the expert relies for his conclusions where—as here—those sources are medical diagnoses which are part of the record in these proceedings. Specifically, Plaintiff's medical records were attached as an exhibit to the First Expert Report, and thus the substance thereof cannot be deemed to be a surprise to IFA.[7] Moreover, IFA would have had the opportunity to conduct discovery regarding the medical records from those with knowledge of their substance in view of the centrality of the records to the issue of damages in this matter. Indeed, Plaintiff has indicated

---

[6] Like the Second Expert Report, the Third Expert Report also eliminates some "double counting" of medical bills and further reduces future damages awards by increasing the discount rate applied. (*Compare* Dkt. No. 222-6 *with* Dkt. No. 222-5).

[7] The Third Expert Report includes summaries of, and excerpts from, reports generated by three of Plaintiff's treating physicians regarding the extent of her injuries and her need for future care. (Dkt. No. 222-6 at 5-6). Dr. Moore attached these physicians' reports as exhibits to the First Expert Report (Dkt. No. 82-1 at 19, 21-22, 25-40), but did not quote from, summarize, or purport to rely on the findings of these reports.

her intent to introduce at trial the records themselves as well as the direct testimony of the doctors who created the records. (*See* Dkt. No. 247 at 1-3, 6).

The Court also finds that there will be no disruption to trial stemming from the calculation corrections or the additional summaries of medical records and Dr. Moore's asserted reliance thereon. The parties need not reopen discovery to address such corrections or to examine summaries of medical records that were already disclosed to IFA.

Considering the fourth factor, IFA has presented no evidence of Plaintiff's bad faith or willfulness apart from the untimely disclosure of the Third Expert Report and the fact that it was first produced in opposition to a *Daubert* challenge raised by IFA. While the Court does not condone violations of its Scheduling Order, nor does it expect that successive iterations of expert reports—seemingly in response to alleged deficiencies identified by the opponent—is, or should be, the norm, IFA has not established willfulness or bad faith. Indeed, in *ZF Meritor*, the Third Circuit did not conclude that the plaintiffs acted willfully or in bad faith by seeking to amend an expert report even *after* it was deemed unreliable and inadmissible by the Court. *Id.*, 696 F.3d at 299.

However, as in *ZF Meritor*, this Court is empowered to evaluate Plaintiff's justification for failing to include this additional discussion of, and reliance on, Plaintiff's medical records in the First and Second Expert Reports. *See ZF Meritor*, 696 F.3d at 299 (noting that plaintiffs "have provided no persuasive explanation" for an expert's failure to include more reliable damage calculations in his initial expert report "other than that [the expert] believed his existing estimates were sufficiently reliable"). Because Plaintiff has offered no such justification, this factor weighs in favor of excluding the additional summaries of medical records.

Considering the final factor, the Court reiterates that when presenting damage calculations to a jury, mathematical accuracy is important. Thus, this factor weighs against excluding the corrected mathematical calculations. However, Dr. Moore's additional summaries of medical records, upon which he relies for his conclusions, is not critical given that the records themselves and doctors who created them are available for trial. *Contra ZF Meritor*, 696 F.3d at 299 (noting the "critical nature" of the excluded evidence and concluding that its importance weighed in favor of admission). Thus, this factor weighs in favor of excluding the summaries of medical records.

In sum, all five *Pennypack* factors favor the admissibility of the Third Expert Report to the extent it corrects prior calculations. With regard to the additional medical summaries, the Court concludes that, on balance, the *Pennypack* factors do not warrant excluding the Third Expert Report to the extent it adds discussion of, and reliance on, Plaintiff's medical records. Accordingly, as discussed above, the Court finds that the Third Expert Report—and thus Dr. Moore's testimony—is admissible to the extent that it corrected calculations and added sources upon which Dr. Moore relies.

### ii.     New Methodology for Lost Future Earning Capacity

The Court reaches a different conclusion regarding the other addition to the Third Expert Report—Plaintiff's introduction of a new methodology to calculate lost future earning capacity. Specifically, the Court finds that Plaintiff would be prejudiced by the introduction of a new methodology at this stage of the proceedings. Unlike the methodology in the first two reports, IFA has *not* had an opportunity to depose Dr. Moore regarding this new methodology, or retain its own expert to address it. While such prejudice "could theoretically be mitigated" by reopening expert discovery, *Jerome*, 2013 U.S. Dist. LEXIS 52931 at *9 (quoting *Gautier-James*

16

*v. Hovensa, L.L.C.*, 2011 U.S. Dist. LEXIS 109756, *28 (D.V.I. Sept. 27, 2011)), doing so at this late stage of the proceedings—with trial scheduled to commence on July 22, 2013—would unfairly disrupt IFA's trial preparation. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 721 (3d Cir. 1997) (noting that the party seeking to offer untimely expert opinion "would have gained a tactical advantage by requiring [the other party] to focus its litigation resources" on the "last-minute scrambling" necessary to challenge the new expert opinion at trial). Further, given the history of this case—with its plethora of motions, requests for extension of time, and missed deadlines by the parties—the "last minute scrambling" involving experts is also likely to disrupt the orderly trial of the case. Thus, this case presents both the prejudice from untimely disclosure of new methodologies and the "time-crunch problem" that were not present in *ZF Meritor*.

Turning to the fourth factor, as noted above, IFA has failed to demonstrate that Plaintiff acted in bad faith in seeking to amend the report. As noted above, however, this Court is empowered to evaluate Plaintiff's justification for failing to include this new methodology in the First or Second Expert Reports. *ZF Meritor*, 696 F.3d at 299. Because Plaintiff has offered no such justification, this factor also weighs in favor of excluding the new methodology.

Considering the final factor, the Court finds that the non-critical nature of the new methodology to calculate lost future earnings also weighs in favor of exclusion. Unlike the critical nature of expert testimony in antitrust cases, *ZF Meritor*, expert economic and vocational testimony are not required to recover lost future earnings in this case. *See Fashauer v. N.J. Transit Rail Operations*, 57 F.3d 1269, 1284 (3d Cir. 1995) (rejecting the "argument that evidence supporting lost earnings capacity must come from a vocational expert"); *Alexander v. Del. & Hudson Ry. Co.*, 2013 U.S. Dist. LEXIS 61677, *18 (M.D. Pa. Apr. 30, 2013) (stating that such damages "can be established through a plaintiff's own testimony and by expert medical

testimony as to plaintiff's physical limitations") (citing *Colyer v. Consol. Rail. Corp.*, 114 F. App'x 473, 483 (3d Cir. 2004)).

Upon consideration of all five factors, the Court finds that exclusion of Dr. Moore's new methodology for calculating lost future earnings is warranted. Thus, Plaintiff may not offer any evidence at trial (whether through portions of the Third Expert Report or Dr. Moore's own testimony) which relies on this new methodology.

## C.     Post-Injury Earning Capacity

Turning to IFA's specific challenges to portions of Dr. Moore's proposed testimony, IFA first argues that Dr. Moore's opinions regarding Plaintiff's post-injury earning capacity should be excluded because they lack sufficient factual basis. In particular, IFA argues that a number of assumptions which underlie Dr. Moore's calculations are impermissibly speculative and not based on record evidence. (Dkt. No. 239 at 4-10). The Court agrees that the factual basis underlying certain assumptions is insufficient.

As the Third Circuit has held, "'although mathematical exactness is not required, [expert] testimony of post-injury earning capacity must be based upon the proper factual foundation.'" *Elcock v. Kmart Corp.*, 233 F.3d 734, 754 (3d Cir. 2000) (quoting *Benjamin v. Peter's Farm Condo. Owners Ass'n.*, 820 F.2d 640, 643 (3d Cir. 1987)). In other words, "an 'expert's testimony [regarding future earnings loss] must be accompanied by a sufficient factual foundation before it can be submitted to the jury.'" *Id.* (quoting *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983)); *see also* Fed. R. Evid. 702(b) (requiring that expert opinion testimony be "based on sufficient facts or data").

Here, as explained in his First and Second Expert Reports and during his deposition, Dr. Moore makes a number of assumptions in order to determine the diminution of dance-related

future earning capacity Plaintiff allegedly has suffered as a result of her injuries. In arriving at this figure, Dr. Moore creates a projection of what Plaintiff would have earned through dance over the remainder of her assumed work-life expectancy, and subtracts what he believes she is now capable of earning. Specifically, Dr. Moore first calculates the average annual income Plaintiff derived from dance-related activities by examining pre-injury tax returns. To determine what Dr. Moore believes Plaintiff will earn post-injury, he assumes that Plaintiff will be able to work for 20 hours per week, and that she will earn twice the minimum hourly wage in California, where she resides, by working in the retail setting. Next, Dr. Moore calculates Plaintiff's annual projected salary by multiplying the assumed hourly rate by the assumed number of hours Plaintiff can work each year. Finally, Dr. Moore takes the difference between her pre-injury average dance-related earnings and her assumed post-injury earnings, projects this annual deficit across the remainder of her assumed work-life expectancy (through age 65), adjusts for inflation, and decreases the sum to present value. (*See* Dkt. Nos. 201-2, 222-5).

IFA challenges these assumptions and points to Dr. Moore's deposition testimony to support the proposition that he lacked the proper factual foundation to make them. As to Plaintiff's future employment, Dr. Moore assumes that Plaintiff will earn $16 per hour while working part-time in the retail setting for the remainder of her work-life expectancy. His reports provide no explanation of how Plaintiff's alleged physical limitations would enable her to work in a retail setting while preventing her from working in a myriad of other occupations not related to dance or retail. Similarly, Dr. Moore provides no basis from which one could conclude that Plaintiff would make $16 per hour in retail, apart from noting that $16 per hour is twice the current minimum wage in Plaintiff's home state of California.

An expert's opinion, however, requires a proper factual foundation, which such speculation does not provide. *See Schneider*, 320 F.3d at 404 (requiring that an expert have "good grounds" for his opinion, and that his opinion not be based on "subjective belief or unsupported speculation"); *Calhoun*, 350 F.3d at 321 (noting that district courts must ensure that "the expert's opinion [is] based on the methods and procedures of science rather than on subjective belief or unsupported speculation") (citations and internal quotation marks omitted).

When questioned at his deposition about this issue, Dr. Moore conceded that these assumptions were not based on information received from any vocational rehabilitation professional or other individual with professional knowledge sufficient to evaluate Plaintiff's post-injury employment opportunities. Rather, Dr. Moore indicated that the claim that Plaintiff would be limited to working in the retail setting was based on Plaintiff's own thoughts regarding her future employment alternatives. (Dkt. No. 255-1 at 108-10). An expert, however, is not permitted to simply rely on a plaintiff's own speculative belief regarding her future earning capabilities. *See Benjamin*, 820 F.2d at 643 (deeming improper expert's post-injury earning capacity opinion predicated on the assumption that the plaintiff would earn only $10,000 annually as a result of an injury, where the expert relied on the plaintiff's "personal belief as to his [earning] capabilities," and the expert "had neither training in vocational rehabilitation nor professional knowledge as to [the plaintiff]'s capacity to continue working a particular job").[8]

---

[8] While testimony from a vocational rehabilitation professional is not required to recover damages for lost future earning capacity, *see supra*, Part III.B.4.ii., an expert cannot offer an opinion on the issue absent the proper factual foundation. *Schneider*, 320 F.3d at 404. Courts must ensure that this threshold is met before permitting an expert to testify because "the opinion of a witness impressed by the court with the label of 'expert' may carry a great deal of weight with a lay jury, particularly in matters as complex as lost future earnings assessments." *Benjamin*, 820 F.2d at 641.

Moreover, an expert's assumptions may not ignore the actual facts of the case. *See Elcock*, 233 F.3d at 756 (deeming an expert's opinion inadmissible because it "[i]gnor[ed] 'the real world of'" the plaintiff by: (1) assuming that the plaintiff was completely disabled, despite evidence that she continued to work in some capacity after the injury; and (2) making a "questionable" assumption regarding her life expectancy that ignored record evidence about her actual health); *Gumbs*, 718 F.2d at 98 (concluding that an expert could not assume that, but for his accident, the plaintiff would have gone on to earn twice his pre-injury average income or that he would receive $1700 in annual fringe benefits where these assumptions were not "accompanied by a sufficient factual foundation") (citation omitted). Here, Dr. Moore's future earnings projection ignores both the type of work Plaintiff has performed since the accident and her income derived therefrom. Contrary to Dr. Moore's assumption, Plaintiff has not been constrained to working for an hourly wage in the retail setting. Instead, she received a real estate license in 2005 and has earned income in that field since the date of the accident. Similarly, Dr. Moore's assumption ignores Plaintiff's documented post-injury earnings. In fact, Dr. Moore conceded during his deposition that Plaintiff earned nearly two-and-one-half times more money in real estate income in 2009—the year after the accident—than she had made in the dance field in any pre-injury tax year that he had examined. (Dkt. No. 255-1 at 10-11).[9] Thus, both the type

---

[9] Dr. Moore agreed that the tax records indicate that Plaintiff earned $58,935 in 2009 from real estate, while her highest annual dance-related income in the years that he examined was $23,651 in 2006. (Dkt. No. 255-1 at 122; Dkt. No. 201-2 at 6). While his Third Expert Report subsequently claims that her higher real estate earnings in 2009 were the result of a "one-time[,] nepotism[-]based transaction" and should not be considered (Dkt. No. 22-6 at 4), the fact remains that Dr. Moore's reports otherwise ignore Plaintiff's real estate earnings, and provide no discussion of how much she has earned from real estate before or after the accident. Dr. Moore's assumption regarding future earnings—that because Plaintiff can no longer work in the dance field, she will be limited to working for an hourly wage in retail—cannot simply ignore the other income-generating activities in which she has been, or could be, engaged.

of work Plaintiff has actually done since the accident and the amount of money actually earned belie Dr. Moore's assumptions.

By contrast, Dr. Moore's other assumption—that Plaintiff will be limited to working 20 hours per week—has sufficient factual support in the record. In his reports, Dr. Moore indicates that he assumed Plaintiff would be limited to part-time employment because: (1) "it has been acknowledged by her doctors that she continues to suffer from the injury such that it hampers her ability to devote long periods of a day to many of the functions required for full time employment"; and (2) Plaintiff is currently visiting therapists three times a week for a total of eight hours. (Dkt. No. 201-2 at 4). While IFA may disagree with the exact number of hours Dr. Moore assumes Plaintiff may be able to work as a result of these alleged limitations, such a challenge is appropriately raised on cross examination. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross examination.") (citations omitted).

Notwithstanding the sufficiency of the factual support in the record underlying Dr. Moore's 20-hour per week assumption, there remains an absence of factual support for Dr. Moore's assumptions that Plaintiff would earn $16 per hour in retail. Because these latter assumptions regarding future employment lack sufficient factual foundation, the Court may not permit Dr. Moore to submit them to the jury. *Elcock*, 233 F.3d at 754. Accordingly, since Dr. Moore's calculations regarding lost future earnings incorporate the unsupported assumptions, the

Court will not permit Dr. Moore to offer an opinion at trial regarding Plaintiff's diminished future earning capacity.[10]

Plaintiff argues against exclusion of Dr. Moore's opinion regarding post-injury earning capacity on the grounds that his Third Expert Report cures any deficiencies of the first two reports. (Dkt. No. 247 at 1-6). As discussed above, however, the Court will not permit Dr. Moore to offer the new methodology for calculating lost future earnings presented in the Third Expert Report. Thus, this excluded methodology cannot bolster the infirmities of Dr. Moore's first two reports regarding future earning capacity. Accordingly, the Court is not dissuaded from its

---

[10] Dr. Moore also makes a questionable assumption regarding Plaintiff's work-life expectancy: that absent the injury, Plaintiff would have worked as a professional dancer or choreographer until age 65. When questioned about this assumption, Dr. Moore conceded that he did no work to determine, nor does his expertise in economics qualify him to determine, whether a dancer/choreographer could be expected to work until age 65. (Dkt. No. 255-1 at 113-14). Instead, he used age 65 in his calculations because he believes it to be "the generally accepted date of retirement from the labor force in our society at this time," and the date at which "full Social Security benefits [are] made available by the federal government." (*Id.* at 70, 112). Dr. Moore conceded that he had no authority to support that *a dancer or choreographer* could work until this general age of retirement other than his own "visceral belief." (*Id.* at 113-14) (also stating that "[i]t was believable to me, which is why I used it"). Dr. Moore rationalized the lack of support for his work-life expectancy assumption with the statement: "In the absence of other authorities, in order to do the report, you have to put a number in the blank." (*Id.* at 113). The Court is troubled by this assumption and Dr. Moore's justification for it. *See Elcock*, 233 F.3d at 756 (deeming inadmissible an economic expert's opinion regarding future earning capacity because his assumptions lacked foundation in the record, including the "questionable" assumption that the Plaintiff would live and work to the average retirement age for women of her race, even though the plaintiff's own medical expert testified that the plaintiff's poorly controlled diabetes could cut her work-life span short). However, in view of the Court's conclusion that Dr. Moore's opinion regarding diminished earning capacity is rendered inadmissible by the lack of factual support for his underlying assumptions that Plaintiff would earn $16 per hour in retail, the Court need not reach the issue of Dr. Moore's questionable assumption regarding Plaintiff's work-life expectancy.

conclusion that Dr. Moore's opinion regarding Plaintiff's alleged diminished future earning capacity is unreliable and inadmissible.

**D.      Remaining Challenges**

IFA raises three additional challenges to portions of Dr. Moore's proposed expert testimony: (1) that the discount rate he employed to reduce future damages to present value was too low; (2) that the future medical expenses calculation is too high because it is based on a misreading of Plaintiff's medical records; and (3) that he overestimates the increase in insurance premiums Plaintiff will have to pay after the accident by underestimating the rate at which her pre-injury policy premiums would increase. (Dkt. No. 239 at 13-19). These issues may be appropriately explored on cross-examination, but they do not warrant exclusion of Dr. Moore's opinions.

Once an expert's opinion has met the foundational requirements for admissibility, the burden shifts to the adverse party to explore any deficiencies through cross-examination. *Stecyk*, 295 F.3d at 414; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The Court's pretrial evaluation of an expert's opinion is limited to determining its admissibility; the jury must ultimately evaluate the expert's credibility and the weight which should be afforded to any admissible opinion. *See Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891) ("[D]etermining the weight and credibility of [a witness's] testimony . . . belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men . . . .").

Here, IFA's remaining arguments go to the weight which should be afforded to a number of Dr. Moore's opinions, and not the foundational requirements for admissibility of expert

24

opinion testimony. With regard to the first argument, IFA claims that "a higher discount rate would be more appropriate" than the rate Dr. Moore used to reduce future damages to their present value. (Dkt. No. 239 at 15). Counsel for IFA also raised this issue during Dr. Moore's deposition, wherein Dr. Moore readily conceded that the discount rate originally used was too low. (Dkt. No. 255-1 at 178). Dr. Moore also noted that he increased the discount rate in his Second Expert Report to address this issue. (*See* Dkt. No. 222-5). The Third Expert Report increases the discount rate further. (Dkt. No. 222-6 at 14). While the parties may still disagree over the precise discount rate which should be utilized, such disagreement does not rise to the level of a legitimate Rule 702 challenge to qualification, reliability, or fit so as to warrant exclusion of the testimony.

IFA also argues that Dr. Moore overestimates Plaintiff's future medical costs by misreading reports generated by Plaintiff's physicians regarding the type, amount, and cost of necessary future medical care. (Dkt. No. 239 at 16-18). Counsel for IFA raised this issue during Dr. Moore's deposition, and Dr. Moore conceded his error. (Dkt. No. 255-1 at 180). Dr. Moore's Second and Third Expert Reports address the error identified by IFA, and reduce his future medical expense estimate by over $1,500,000. (*Compare* Dkt. No. 201-2 *with* Dkt. No. 222-5 and Dkt. No. 222-6). IFA remains free to further address any perceived error on cross-examination. However, IFA's argument in this regard does not present the type of methodological, factual foundation, or other challenge to Dr. Moore's opinion regarding future medical care that would warrant its exclusion.

Finally, IFA argues that Dr. Moore's calculations also overstate the increase in insurance premiums that Plaintiff will have to pay as a result of the accident. In his reports, Dr. Moore concludes that Plaintiff's insurance premiums will increase for two reasons: (1) Plaintiff

25

currently pays more for private insurance than she did when she was on a subsidized plan which was available to her through the Screen Actors Guild ("SAG") during her pre-injury career as a dancer; and (2) he estimates that her current insurance premiums will increase at an annual rate of eight percent, while the subsidized SAG policy premiums will increase at only four percent per annum. (Dkt. No. 201-2 at 8). IFA argues that this four percent difference between the rising costs of the two policies is unjustified and results in an overestimation of Plaintiff's damages. (Dkt. No. 239 at 18-19). At his deposition, Dr. Moore explained that he based his calculations pertaining to the increase in insurance premium costs on a published survey on the rate of increasing insurance premiums as compared to the rate of inflation and increasing average wages. (Dkt. No. 255-1 at 162). Once again, while IFA remains free to cross examine Dr. Moore on the subject of insurance premiums, this challenge is an insufficient basis upon which to exclude Dr. Moore's testimony on this subject.

In sum, these three arguments raised by IFA may prove appropriate fodder for cross-examination at trial, but do not warrant the pretrial exclusion of Dr. Moore's proposed testimony. Accordingly, the Court will deny IFA's Motion to the extent it seeks to exclude Dr. Moore's opinions regarding future medical expenses, increased insurance premiums, and the discount rate utilized to reduce future damages to their present value.

## IV.   CONCLUSION

For the reasons stated above, Dr. Moore's opinions regarding Plaintiff's lost future earning capacity lack an adequate factual basis in the record and must be excluded. Plaintiff's remaining challenges, however, go to the weight to be afforded to Dr. Moore's other opinions, and not the admissibility thereof. Accordingly, the Court will grant IFA's "Renewed Motion In Limine to Exclude the Opinion of Dr. Richard Moore" (Dkt. No. 238) in part and prevent him

26

from testifying regarding Plaintiff's lost future earning capacity. The Court will deny IFA's Motion to the extent it seeks to exclude Dr. Moore's opinions regarding future medical expenses, increased insurance premiums, and the discount rate utilized to reduce future damages to their present value.

An appropriate Order accompanies this Memorandum Opinion.

Date: July 11, 2013                                    _____/s/_____
                                                       WILMA A. LEWIS
                                                       District Judge

27